CORNELIUS C. McCLARY

*v.*

STATE OF TENNESSEE ex rel.

362 S.W.2d 457.

(*Knoxville,* September Term, 1962.)

Opinion filed November 9, 1962.

JESS PARKS, W. CORRY SMITH, CHARLES W. LUSK, JR., Chattanooga, for plaintiff in error.

· EDWARD E. DAVIS, District Attorney General, Chattanooga, for the State.

64

Mr. Justice Burnett, delivered the opinion of the Court.

In May, 1961, McClary was convicted in the Criminal Court of Hamilton County as a professional gambler. Upon this conviction the District Attorney General filed the present proceeding to forfeit McClary's Thunderbird Ford automobile allegedly used in the furtherance of McClary's avocation as a professional gambler. This action was filed pursuant to the provisions of Chapter 234 of the Public Acts of 1955, which has been codified and is found in the Supplement to the Code in sec. 39-2031, et seq. This Act is commonly known under the name of its author as the Johnson Act.

The trial court and the Court of Appeals found in favor of the State and forfeited this Thunderbird automobile to be sold in accordance with the statute. The Court of Appeals in affirming the trial court rendered an excellent opinion, finding fully the facts as shown by the criminal record under which McClary was convicted. We adopt this finding of fact as ours, because it correctly and succinctly states the facts as shown by this record. This finding is:

"The numbers racket is somewhat involved. First, there must be the saleman, or 'writer'. He takes bets

from the bettors, using triplicate slips, one of which is given the bettor, and the writer gives one to the collector or 'bag man', or 'mainest bag man' who gives it to the banker. One is retained by the salesman. Such tickets contain a symbol for the salesman, show the amount bet on each number. If number 'hits' the return is 500% to 600% of the amount bet. The odds against hitting seem to be greater than 1000 to 1. The winning number is determined by certain figures derived from the total sales of cases of eggs and total sales of pounds of butter on any certain market. It is evident that an automobile is of prime necessity for the salesman or writer to make his rounds, to the bag man in collecting from the salesman, and then getting the aggregate to the banker.

"The sales of these commodities are released about 10 A.M. each day; hence it is important that the bets be laid before that time and received by the banker before the cut off date; otherwise the banker could be victimized by numbers bet on after the aforesaid total sales had been announced.

"McClary, a resident of Cleveland, Tenn., had since 1954 been filing with the Federal Government tax returns and applications for registry to engage in wagering. The International Revenue Code defined wagering as (a) any wager with respect to sports events; (b) wagering pools on sports events; and (c) lotteries. He was assigned the number 62-170P.

"Copies of his monthly returns from August 30th, 1960, to March 31st, 1961, showed he was accepting wagers averaging a little less than $4,000.00 per month, upon which he paid promptly 10% to the

U. S. Treasury Department. The record does not show receipts prior to August, 1960. These returns were prepared for him by an attorney in Chattanooga.

"Of course, this demonstrates that he was engaged in gambling, authorizing among other things the conduct of a lottery.

"Now as to his activities in Hamilton County: He had been under 'surveillance' by Frank Mallicoat, a deputy sheriff, attached to the office of the District Attorney as a criminal investigator, who began his investigation some days prior to January 13th, 1961. On that date he began this surveillance of McClary and observed him in this Thunderbird coming out of Noah Reid Road into Bonny Oaks Drive. He saw Fred Ables (not identified in this record) in this same vicinity. This was about 10 A.M., which will be remembered as the target date in the butter and eggs racket. The next time he saw McClary was January 18th, about 10:05 A.M., when he observed McClary turning off of the Lea Highway into the Bonny Oaks Drive. He also again saw Fred Ables that same day. This was at the rock quarry, time not given. On Jan. 19th, he observed Ables traveling on Noah Reid. About 10:20 A.M. McClary came out of Bonny Oaks Drive and went North on No. 11.

"On Jan. 20th, 1961, Mallicoat had a warrant for the arrest of McClary and undertook to arrest him thereon at an underpass on Bonny Oaks Drive. Mallicoat was in plain clothes and so far as the record shows was not known to McClary. However, his car was equipped with the usual two way radio equipment and antenna used by police officers, although not other-

wise marked. When he was undertaking this arrest his car was blocking this underpass. McClary aproached about 10:15 or 10:20. Mallicoat got out of his car to serve the warrant and when he did so McClary threw his Thunderbird in reverse, and after turning, left at a high speed. Mallicoat then quickly turned his car and followed at the highest speed he could make which was somewhat less than the Thunderbird. He (Mallicoat) was making about 100 miles per hour, but the Thunderbird was 'moving out. It was leaving the car that I was driving because that was as fast as I could travel.' But he did get close enough to see butter and eggs tickets floating in the air, some eight or ten feet in the air in the center of the road then being traversed by the Thunderbird, which dodged off into a side road. Mallicoat couldn't make this turn, ran past and after getting some gas went back to where he had seen these tickets floating in the air and found a number of them on the road. This was about 2/10ths of a mile from where McClary turned off of this road. He then followed this turn-off road and found the Thunderbird had slid off of the road but McClary had left, no doubt having business elsewhere.

"Some of these tickets were for butter and eggs (B.E.) some were for 'stock, i. e., covering a lottery on stock sales, and some were a combination of both butter and egg and stock. Some bore date of Jan. 20th, 1961, the day of the arrest.

"This is all the evidence; McClary did not testify.

"Was it sufficient to establish that this automobile was being used in conducting a lottery in Hamilton County?

"We hold that it was. McClary was a professional gambler. So far as the record goes he had no other avocation which would require his presence in Hamilton County on these dates so near the crucial cut off time of 10 A.M. When he saw this car of Mallicoat blocking the underpass he immediately backed up, turned and made a fast exit, and in so doing began to get rid of the evidence of his crime by throwing the slips of the bettors out of the car window."

The two lower courts have concurred in finding that the use of this Thunderbird automobile in the professional gambling of McClary was an integral part of the gambling operation that he was conducting in Hamilton County. The facts fully support such a finding and conclusion. The Court of Appeals likewise found, and such a finding is supported by this record, that "an automobile is a necessity for the operation of a lottery of this nature."

Section 39-2033, T.C.A., gives the definitions of various and sundry things which are applicable to the Act, such as "gain", "gambling", "professional gambling", etc., and one subdivision thereof says:

"(7) 'Gambling premise' means any building room, enclosure, vehicle, vessel or other place used or intended to be used for professional gambling. In the application of this definition, any place where a gambling device is found shall be presumed to be used for professional gambling."

Then follows other definitions. In the following Section, that is, sec. 39-2034, T.C.A., gambling devices, as defined above, are declared to be a common nuisance, and in this Section confiscation is likewise authorized and certain penalties prescribed. In subdivision (3) hereof, it is provided that:

"(3) All furnishings, fixtures, *equipment* and stock, including without limitation furnishings and fixtures adaptable to nongambling uses and equipment and stock for printing, recording, computing, transporting, safekeeping or (except as otherwise provided in subsection (3) of sec. 39-2035) communication used in connection with professional gambling or maintaining a gambling premise, and all money or other things of value at stake or displayed in or in connection with professional gambling or any gambling device, *shall be subject to seizure,* immediately upon detection, by any peace officer, and shall, unless good cause is shown to the contrary by the owner, be forfeited to the state by order of a court having jurisdiction, for disposition by public auction or as otherwise provided by law." (Emphasis supplied.)

Then follows certain language with reference to liens, etc.

It will be noted that from the quotation above the words "except as otherwise provided in subsection (3) of sec. 39-2035" are contained. When we look at this subsection (3) of sec. 39-2035 we find this:

"Facilities and equipment furnished by a public utility in the regular course of business, and which remain the property of such utility while so furnished,

shall not be seized pursuant to subsection (3) of sec. 39-2034 (the section we have just quoted above) except in connection with an alleged violation of secs. 39-2031—39-2037 by such public utility, and shall be forfeited only upon conviction of such public utility therefor.''

We cite this exclusion for the purpose of showing that by making this exclusion, and this is the only exclusion from the things which are to be forfeited, it is clear that the Legislature by providing the things that should be forfeited when used in professional gambling intended that it should include everything that was used regardless of what it was. The term that they used ''transporting'' clearly to our mind would include an automobile, when it is shown and found that this automobile was used in this operation, and this reasoning becomes more apparent when we have a concurrent finding of fact of the two lower courts that the use of this automobile was an integral part of this gambling operation.

The reading of this Act shows clearly, to our mind, that it was the intention of the Legislature in making the declaration that they have herein that the use of these things in operation was to establish a rule of evidence to be used in the trial of a claim of property created by the Act. Such presumption places the burden upon the claimant of the property to come forward with evidence to overthrow the showing that it was being used in the furtherance of a gambling transaction.

This statute (the Johnson Act) was clearly enacted by the Legislature to discourage and prevent unlawful gambling, and the courts will not construe the enactment in such a fashion as to charge the Legislature with delib-

erately rendering impotent the clear and unambiguously expressed intention of the whole Act. Thus it is our duty under a factual situation as hereinbefore shown to construe the Act to meet the overall purpose envisioned by the Legislature as it is discerned from the context of the entire Act, and restrictions or limitations not specifically contained therein will not be added by judicial interpretation, especially if they are prejudicial to the public good.

For us to adopt the petitioner's construction and contention would culminate in easy and frequent evasions of this enactment; it would be a perversion of the legislative intent, and contrary to the usual rule of construction that legislation must be accorded a rational interpretation consistent with its manifest purpose.

We think that the interpretation here put on this Act under this factual situation is clearly within the manifest intent of the Legislature. It results that the judgment of the Court of Appeals is affirmed.